Filed 10/6/23  R.M. v. Superior Court CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| R.M.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>    Real Parties in Interest. | A168289<br><br>(Contra Costa County Super. Ct. Nos. J2100247, J2100248) |

Before us in this dependency proceeding involving two siblings, N.H., a boy, age eleven, and B.H., a girl, age eight (collectively the children), is an extraordinary writ petition from one of their parents challenging an order terminating family reunification services and setting a permanency review hearing under Welfare and Institutions Code section 366.26 (.26 hearing).[1]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

The sole petitioner is R.M. (Father), the presumed father of N.H. and B.H. Father argues that the dependency court erred by denying his request for a continuance of the .26 hearing for a period of up to 24 months. At the time the court ruled, the 18-month deadline under section 366.22, subdivision (a), for holding a .26 hearing had expired. Invoking *In re D.N.* (2020) 56 Cal.App.5th 741 (*D.N.*), Father claims there were extraordinary circumstances justifying an extended period of reunification due to various factors beyond his control.

We see no error. After granting one six-month extension of the 12-month reunification period, the dependency court found that a second such extension at 18 months was unwarranted. In so ruling, the court specifically found that Father's inability to reunify with N.H. and B.H. within 18 months was no one's fault but his own. Because that finding is supported by substantial evidence, we must conclude the court was within its discretion to rule as it did.

The termination of reunification services to Father and the setting of a .26 hearing was proper.

## I. BACKGROUND

### A. *Initial Removal and Detention*

B.H. (Mother) has a long history of substance abuse and mental health struggles, and an extensive criminal record, mostly for drug-related offenses. Until 2021, N.H. and B.H. were residing with Mother; Father lived separately. On May 24, 2021, the Contra Costa County Children and Family Services Bureau (the Bureau), acting upon reports that Mother had left B.H.

and N.H. at home unsupervised, filed a dependency petition alleging neglect, and removed the children from her custody.[2]

At the detention hearing in July 2021, Father appeared, represented by counsel. It was undisputed that Father is the biological father of N.H. As to B.H., Father told the court that he "held out [B.H.] as his daughter, has supported [B.H.], has visited with her, and has a bond with her." The court accepted those representations, and declared Father to be the presumed father of both N.H. and B.H.

On the issue of custody, Father stated that he wanted "[B.H.] in the household with her brother, [N.H.]" and argued that the best way to protect their sibling relationship was to give him custody of both of them. The court accepted that argument too and gave the Bureau discretion to release both children to Father's custody. Following the July 2021 detention hearing, the Bureau placed N.H. and B.H. together in Father's home, subject to a detailed safety plan.

In a dispositional report in September 2021, that Bureau reported that Father had two older children (ages 26 and 35) from a different relationship. At that time, Father also said he had taken steps to enroll in the parenting class required by his case plan, but had yet to enroll. And despite the drug testing requirement in his case plan, he said he was not yet testing because of a significant delay by the Bureau and the testing agency in processing a referral for testing.

---

[2] The family had a significant prior dependency history. For example, during a previous dependency proceeding, an older sibling, Br.V.H. (the sister of N.H. and the half-sister of B.H.), was removed from Mother's custody upon allegations of neglect. Mother failed to reunify with Br.V.H., who remains in a foster home placement.

**B.** *Placement With Father and Removal from his Custody*

Father's status as a presumed father of both of the children allowed him to take custody of B.H. without having to pass the Bureau's vetting process for non-family custody placements. According to the Bureau, the vetting process would have been problematic for him because, like Mother, he had an extensive criminal record, mostly for drug crimes. His roommate also had a criminal record.

Father's most recent convictions were for possession of controlled substances for sale, possession of an assault weapon, and unlawful possession of ammunition. In 2016, these convictions resulted in a six-year prison term. During Mother's previous dependency proceeding, see footnote 2, *ante*, Father was in prison, still serving that term. But by the time N.H. and B.H were removed from Mother's custody in May 2021, he was out of prison and had successfully completed a period of supervised release.

The placement of N.H. and B.H. in Father's custody turned out to be brief. Under the court ordered case plan put in effect as a condition of the children's placement with him in July 2021, he was required to, among other things, "participate in random drug testing," "refrain from using drugs/alcohol/non-prescription medication," and "allow no contact between [Mother] and children until approved by [the Bureau]."

In October 2021, Bureau filed a subsequent petition under section 387 alleging that, shortly after taking custody, and in violation of the placement order, Father tested positive for methamphetamine use, had a 20-year history of drug use, and had allowed Mother to have access to N.H. and B.H. without obtaining the court's permission.

According to the Bureau, "the children have maintained well in the home with father. They have been attending school and completing homework. [Father] has been responsive to the needs of the children such as

4

purchasing clothing, shoes, transporting to medical visits and ensuring they enjoy extra-curricular activities. The children have also [expressed] . . . their joy and satisfaction in their father's care. . . . Therefore [Father's] recent . . . positive [test] for illicit substances and failure to adhere to the safety plan was unexpected."

The children were removed from Father's custody at that point, and after a combined detention and jurisdictional/dispositional hearing on the subsequent petition, the court sustained the Bureau's allegations on Father's plea of no contest, placed the children with a foster care provider, and ordered that both parents receive family reunification services, with twice a week supervised visitation. Mother and Father were advised that "they have until 7-25-22 to reunify" with the children.

C. *The Six-Month Status Review Report*

In the first status review report, prepared at the six-month mark in February 2022, the Bureau reported that Father was making good progress in meeting the requirements of his case plan, was trying hard to attend all of his allowed visits, and was having positive interactions with the children during visits. But from the outset there were signs of problems, mostly concerning drug usage and Mother's continuing erratic behavior.

According to this initial status review report, "Both parents have continued to struggle with their sobriety and despite the provision of services and their ostensible efforts, neither ha[d] made substantial progress in a way that demonstrates their ability to provide the children with a safe and nurturing environment."

Addressing Father's situation in particular, the Bureau stated that he had "not demonstrated any clear insight into his own recovery needs." Also, "despite [Father's] assertion that he has demonstrated his ability to keep the children safe from the negative consequences of substance abuse, he has been

5

largely unable to demonstrate . . . clear strategies to keep the children safe from their mother's behaviors."

**D.** *The 12-Month Status Review Report*

The Bureau's twelve-month status review report in July 2022 noted only "partial" compliance by Father with his case plan and only "minimal" compliance by Mother with her case plan. The Bureau recommended that parents should be "inform[ed] that if they are unable to resume custody of the children by the next review hearing, then the court will make a permanent plan for each child, which could include terminating their parental rights."

With respect to Father, the Bureau's overall assessment was still mixed. On the positive side, the Bureau reported, "Since the last [review] hearing, the children's father . . . has made notable improvements in addressing the issues that necessitate child welfare intervention." Despite some drug-testing no shows and positive results for ethanol in his blood, he demonstrated an acute awareness of his continuing need to demonstrate abstinence in order eliminate any concerns about his "past substance abuse creat[ing] significant risk to the children's health and safety."

Most significantly, the children began to show a change in attitude about wanting to be returned to Father's care. For example, their foster care provider "noted an increase" in N.H.'s aggression and anger, and said he "has been quite vocal in his assertion that he does not want to be returned to either parent." N.H., typically a child who was "quite taciturn" and reluctant to talk about "emotional issues," told the assigned social worker, Christopher J., that he felt no "emotional attachment to his father especially in comparison to his . . . resource parents."

Father, on the other hand, seemed steadfast in his desire to earn the right to have the children returned to him. He "was eager to demonstrate his ability to provide for the children's material needs," and in an inspection of

his home, the "residence…was observed to be very clean, neatly and appropriately furnished, and fully stocked with plenty of food for the household." The Bureau was impressed with the insights about parenting that Father demonstrated having learned in his family support services counseling sessions.

But "[d]espite the relatively positive interaction with their parents during visits," the Bureau reported that "both children remain[ed] very firm in their respective assertions that they [did] not want to return to their parents' care and . . . much prefer[red] to remain in the care of their resource parents." N.H., in particular, the Bureau reported, "has been very expressive in describing his emotional attachment to his resource father." He "passionately" expressed that "he feels valued and nurtured in ways he never experienced with his own father."[3]

Father had also missed a number of his mandatory drug tests, something the court expressed significant concern about at the 12-month review hearing. The court took note of the Bureau's observation that it had not received any positive test reports since May 2022, and pointed out a number of more recent testing "no shows." The court recognized that the situation was a "delicate" one, but expressed concern that the Bureau was not

---

[3]The clearest signs of resistance from the children to reunification with Father appear to have surfaced in conversations between N.H. and B.H. and Christopher J. in around August 2022, more than 12 months into the reunification process. When Christopher J. explained to N.H and B.H. that the purpose of their continued visits with Father was to make it possible for them eventually to return to Father's custody, they were both very unhappy. B.H. became "visibly tearful." N.H. was less expressive, "but he did say enough" to make it clear "in no uncertain terms that he did not want to" return to Father's care.

taking the "no shows" more seriously and seemed inclined to "fast track" unsupervised visits despite "how the children are feeling."

Father took the position that he just needed more time with N.H. and B.H. He was "quite insistent that he has not had sufficient opportunity to effectively bond with the children given the travel and time restrictions to which he must adhere" during unsupervised visits. Christopher J. was sympathetic to that perspective, and at that stage of its continuing review of the reunification process, the Bureau agreed. Its 12-month review report stated that Father "appears justified in his frustrations about the slow progress of expanded visitation."

While acknowledging the court's concerns that things could "backfire" and cause the children to pull away from Father if visitation time was increased too quickly, in the end the Bureau asked for—and the court granted—authority to increase Father's visitation time gradually, and eventually to begin allowing unsupervised visits. Pursuant to that authorization, in September of 2022 the Bureau began allowing unsupervised visits.

### E. *The 18-Month Status Review Report*

In the 18-month status review report, prepared in November 2022, the Bureau reported that Mother had wholly failed to comply with the mental health and drug testing requirements of her case plan, and that her visits with the children had been "inconsistent." It recommended termination of any further reunification services to her. With respect to Father, however, the Bureau's assessment was more nuanced and ultimately favored giving him another six months of reunification services.

The Bureau noted continued efforts by Father to develop a sufficiently strong paternal relationship with the children to warrant their return of custody to him. As of early November 2022, it reported, Father "has been in

full compliance with his visitation since the last hearing." But the Bureau's overall assessment remained mixed, and there were continuing signs that Father was having trouble building his relationship with the children.

Reiterating a concern stated in the 12-month review report "about the lack of the children's emotional ties" to Father being "a function of his lack of positive and consistent engagement with them during the time they were in his care," in the 18-month review report the Bureau said that Father's engagement with the children during visits continued to be "inconsistent." According to a family therapist, the Bureau said, Father "still does not present with the parental instincts that are conducive to enhancing his emotional bond" with them. The Bureau also reported that "[t]he children . . . remained adamant" about not wanting to continue visits with their father, as they do not feel any emotional connection to him.[4]

N.H. even reported that "during a recent visit, [Father] pressured him to advise [Christopher J.] that he just wants to be returned to his father's care without having to continue with visitation. [N.H.] was quite clear in his assertion that [Father's] directive made him incredibly uncomfortable, especially since he prefers to remain with his current caregivers instead of being returned to his father's care." If true, the Bureau stated, this incident was "very troubling, particularly since [it] . . . would appear to be an attempt to circum[vent] the case plan."

---

[4] As of November 2022, N.H. and B.H. had been in multiple foster care placements, including extended stays with two of them. The Bureau reported it was "especially concerned about the children's relatively quick bonding with the caregivers in two separate resource home placements, as their assertions about wanting to stay at the respective placements appears strongly indicative of their receipt of the care and attention they firmly assert is lacking in their relationship with their father."

The Bureau's bottom line view, however, once again in line with Father's perspective, was that reunification could still succeed and that Father just needed more time with the children. The Bureau "readily acknowledge[d] the children's strong resistance to returning to their father's home," but opined that this consistently demonstrated reticence by the children could be "remedied through ongoing family counseling and individual therapy," and was in itself "not [a] sufficient reason to obviate continued reunification."

"Despite the noted concerns," the Bureau stated, Father has "made significant and consistent progress over the past 18 months in addressing the substance abuse issues that warranted protective services, and there is a substantial probability that the children can be returned to his care by May 25, 2023"—24 months after their detention—"if services are extended to that date."

Accordingly, the Bureau recommended that the court find "[F]ather has demonstrated the capacity and ability both to complete the objectives of his [case] plan and to provide for the [children's] safety, protection, physical and emotional well-being and special needs."

## F. *N.H Runs Away and Accuses Father of Threatening Him*

Even with expanded opportunities for bonding in the fall of 2022, even with the generous stance toward Father's prospects for reunification that the Bureau took in its 18-month status review report, the circumstances surrounding Father's relationship with the children took a turn for the worse in the final weeks of 2022.

During a Halloween overnight visit with Father, a visit both children resisted after expressing a preference to spend that holiday with their resource family, Father once again hung back and failed to engage with the

10

children. "[B]oth of the children said that they had gone trick or treating . . . , but it was dad's girlfriend that actually took them from house to house, while [Father] kinda stood back."

A few weeks later, at an unsupervised visit in Father's home over Thanksgiving, there was a crisis. N.H. ran away and was found wandering miles away. He reported to the police officer who found him that he did not feel safe in Father's custody. As recorded in a police report, N.H. told the officer of discovering that Father was selling marijuana, and Father threatened to "beat" him if he told anyone.

At a supervised visit a few weeks later, in late December 2022, the emotional distance N.H. felt with Father was evident. By Christopher J.'s description, N.H. rebuffed an attempt by Father to show affection, "was quite despondent during the visit and appeared to make concerted efforts to avoid engaging with [Father] throughout their interaction."

Father expressed empathy toward N.H. but seemed to be in denial about the authenticity of N.H.'s negative reaction to him at the late December 2022 visit. "Although [Father] did not blame [N.H.] for the outcome of the visit, he did express his desire for [N.H.] to acknowledge that he was 'coached' into running away and admit to being deliberately untruthful with his allegations . . . ."

"After [Father's] departure from the visit," Christopher J. "interviewed both children to process their visit with [Father], as well as their desired outcome for the dependency. [B.H.] was very confident and clear in her assertion that she wanted to 'have relationships' with both of her parents," "but she does not believe that they can provide her with the safe and nurturing home environment she enjoys at her current resource home, where

she would strongly prefer to remain." And when Christopher J. asked N.H. "about his desired outcome, he replied 'same as her.' "

### G. *April 2023 Addendum Report and 18-Month Review Hearing*

The 18-month review hearing, initially set for November 10, 2022, was continued because Christopher J. fell ill and was unable to attend. He left the Bureau in early 2023, and another social worker was assigned to replace him on the case. In an addendum report filed prior to the commencement of the continued hearing in the Spring of 2023—a report signed by Christopher J. just before he left the Bureau's employ—the Bureau changed its position with respect to Father and recommended termination of reunification services.

The report reads as follows: "Although [Father] is not in agreement with the Bureau's recommendation to terminate services . . . , he does acknowledge and seems to understand the children's position. Specifically, he recognizes that his prolonged absence from their lives has affected their respective relationships . . . . Previously, the Bureau presented recommendations to extend services beyond 18 months . . . . However, further review of the [governing] statutes clarified that the circumstances of this dependency did not meet the legal basis upon which such an order could be made."

By this time, N.H. and B.H. had been placed in four foster homes; had initially settled in and adjusted well in each one; but were removed and given different placements three times, in one case due to exposure to domestic violence and in another case due to abuse and neglect. Just before the 18-month review hearing began on April 27, 2023, the Bureau submitted an update memo advising the court that the children were "do[ing] well in their current placement," were "engaging consistently in supportive educational services through their school," and "[t]hrough support of current caregiver . . .

12

have been able to see older sibling at a relative's home, which has also increased the interactions . . . [they] have with extended family."

The last person to speak before the court took the matter under submission was N.H.'s Court Appointed Special Advocate, Jeffrey B., who took no position on Father's request for additional reunification time. On N.H.'s behalf, he said, "[T]he biggest thing for . . . [N.H.] right now is to have stability." "[S]ince I have known him, which is almost a year and a half, he has been in a variety of placements. Well, two, since I have known him, . . . and he is entering middle school at the end of this month, and I hope that he has some stability because he is a great kid, and he deserves that."

It was against this backdrop that the court made the ruling now before us for review. Following a contested hearing, which took place in several sessions in February, April, June, and July 2023, upon an extensive record, the court accepted the Bureau's recommendation, terminated services for both parents, and scheduled a .26 hearing. The court denied Father's motion for a continuance of the .26 hearing so he could receive an additional period of up to 24 months of reunification services.

Father thereafter initiated this writ petition proceeding challenging the denial of a continuance and the order setting the .26 hearing.

## II. DISCUSSION

" 'Under the current dependency scheme, except in limited circumstances, a parent is entitled to 12 months of reunification services, with a possibility of 6 additional months, when a child is removed from a parent's custody.' " (*M.G. v. Superior Court of Orange County* (2020) 46 Cal.App.5th 646, 660 (*M.G.*), citing § 361.5.) The juvenile court must review the case at least once every six months. (*M.G.*, at p. 660, citing § 366.)

13

"At the review hearings the state must also present evidence that reasonable reunification services have been provided to the parent." (*M.G.*, *supra*, 46 Cal.App.5th at p. 660.) In cases where there is a continuance of the 12-month review hearing to 18 months after removal—as there was here— "*the permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of their parent or legal guardian.*" (§ 366.22, subd. (a)(1); italics added.)

Though phrased in mandatory terms, the timelines established by section 361.5 may be extended for good cause. (§ 352, subd. (a); see *D.N.*, *supra,* 56 Cal.App.5th at p. 762.) "Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor." (§ 352, subd. (a)(1).). "Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." (*Id.*, subd. (a)(2).)

Although Father arguably fits within a narrow subset of parents who may be entitled to a discretionary extension of reunification services because—according to his version of the facts—he was making progress in a court-ordered residential substance abuse treatment following his incarceration (§ 366.22, subd. (b)), a court's discretion to order such an extension is limited. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 629 (*Michael G.*).) The Legislature has established "a presumptive 18-month limit on reunification efforts, subject to extension in certain exceptional cases only if, among other statutory requirements, a court determines that the

14

extension, and resulting delay, is not contrary to the child's interests." (*Id.* at pp. 637–638.)

"Examples include cases where a parent never receives reunification services or a reunification plan over the 18-month reunification period [citation]; the parent was hospitalized for most of the reunification period but demonstrated an 'impeccable record of visitation and efforts to comply with the reunification plan' [citations]; . . . the parent sought a continuance to complete a program required by the reunification plan that was otherwise impossible to finish in time [citation]" (*Michael G.*, *supra*, 14 Cal.5th at pp. 632–633); or the parent, an indigent, was unable to find housing because of the lack of affordable housing during the allowed 18-month period, despite his best efforts (*D.N.*, *supra*, 56 Cal.App.5th at pp. 763–767).

" 'We review the juvenile court's decision to deny a continuance for abuse of discretion. [Citation.] "Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice." ' " (*D.N.*, *supra*, 56 Cal.App.5th at p. 756.) "[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. [Citations.] Broad deference must be shown to the trial judge. The reviewing court should interfere only ' " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citations.]' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

Father contends the trial court abused its discretion in failing to find extraordinary circumstances that, in his view, justified a continuance under section 352. According to him, an "external force"—the "previous [foster] caregivers"—"prevented [him] from spending as much time as was necessary for the children to want to return to his home." He asserts that continuing

15

services would not be contrary to the children's best interests because "both [children] liked visiting [him]" and the record shows he was "well connected" with them. Another "external force" was the termination of family therapy sessions, he claims. Continued family therapy would have broken down the children's resistance to him, Father argues, just as the Bureau's 18-month status review report predicted.

Taking the last point first, no complaint about cessation of family therapy services as a ground for continuance of the .26 hearing was raised below, which results in forfeiture of the issue here. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) But even were we to consider this belated objection now, there is substantial evidence refuting Father's view that additional family therapy would have made a difference here.

The family therapist reported that, "although the children's father has attended all sessions as recommended, his engagement with the children during sessions has been inconsistent." The therapist observed that father "appeared noticeably withdrawn during the session on October 24, 2022, which appeared to be a response to [N.H.]'s obvious reluctance about returning to [Father's] home, which he clearly expressed during the session." According to the therapist, Father's girlfriend attended some of the sessions, was "often more directly engaged [than he was], and both she and the therapist frequently [felt] compelled to prompt him to be a more active participant."

The record amply demonstrates N.H. and B.H. were looking for emotional connection and nurturing that, over the course of more than eighteen months, Father—for whatever reason—showed himself unable to provide. It is reasonable to conclude that more family therapy was not going to change things. Indeed, under the circumstances, requiring the children to

16

participate in more programmatic attempts to return them to Father's care may well have been traumatic for them, as the Thanksgiving 2022 "runaway" incident involving N.H. shows.

Beyond the issue of family therapy, Father's case for a continuance rests primarily on the testimony of Christopher J., the social worker who was assigned to this case for most of its history. A veteran social worker who worked 22 years for the Bureau, Christopher J. left the employ of Bureau in early 2023, but returned to testify at the 18-month hearing, where he expressed his personal view that extraordinary circumstances justified a continuance of the .26 hearing and an extension of time to receive services. As the basis for this opinion, he took the position that certain factors beyond Father's control had obstructed Father's ability to demonstrate a strongly bonded relationship with the children.

Christopher J. highlighted three concerns, while conceding there may be a difference between his personal "opinion and what the law allows." First, he testified to his belief that a former foster family for N.H. and B.H. had deliberately scheduled the children for other activities during two of Father's twelve scheduled visits, causing them to miss those visits. Second, he expressed a concern about "bias" against Father based on Father's criminal record. Third, he testified that N.H. was not being truthful in accusing Father of threatening him.

The trial court considered and rejected each concern. The court found as follows: "I take very seriously any allegations of bias and did see that in the report, and I understand [Christopher J.'s] testimony today. However, it seems as if, after clarification that was provided by [the Bureau's counsel],

17

that the bias he described came down to possibly a loss of visits."[5]   Despite these cancelled visits, the court found that Father did not take advantage of the opportunity he was given to bond with the children during the 10 visits that he had.

The court from time to time addressed Father directly when announcing its findings, stating, "even though you have had several extra months of visits, completely negating any issue about missed visits at an earlier point in time, you had an extra amount of visits.  You are described as

[5] The record is unclear as to who, exactly, harbored the alleged "bias" against Father that Christopher J. referenced.  The Bureau's 18-month status review report, signed by Christopher J., states that a former foster care mother "apparently shared inappropriate information about [Father] in her conversations with [N.H.], which included assertions about his substance abuse history and testing that were clearly inaccurate, and which [N.H.] later used as an argument as to why he should not be returned to his father's care."  In the same vein, the Bureau's February 2023 addendum report, also signed by Christopher J., describes negative statements about Father made by Mother in her visits with N.H.

At the 18-month hearing, however, Christopher J. was less specific. When asked whether Father's criminal and substance abuse history "affected [Father] and how people looked at him in this case," he testified—using the passive tense—that the issue "was often brought up in terms of the safety at his home, the roommate, as well as him."  This suggests implicitly that he was referencing "bias" on the part of the Bureau, but he ultimately backed away from accusing the Bureau of exercising biased judgment.  Addressing whether there was "bias" on the part of the Bureau, Christopher J. said: "[T]he overarching view and opinion was that [the children] should not be returned to him, but the reality is that there was just no time left.  Even if we wanted to provide additional time and additional services, legal precedent just did not allow for that. [¶] But if you are asking me if I believed there was . . . bias against [Father] in terms of people's opinions as to whether or not the children should be returned, absolutely.  But I don't recall that being a determining factor as to why the Bureau . . . argued that services should be terminated."

18

staring at the children, or sitting on the couch and not engaging, and you were insistent that your girlfriend be allowed to come into the visits so that you could have a buffer."

The court continued: Father "has engaged -- has done things in his case plan.The problem is that he is not able to apply the things that he is learning in his case plan, and he is not -- he has not yet taken responsibility for his own actions in where we are and where we have ended up today; not to mention that he continues to engage in and use substances, which is a concern."

Based on Father's drug testing record, the court found that "substance abuse is still a problem" for Father. And in light of that, the court further found, "it is reasonable to believe that any hint of [Father's] being under the influence of some substance might understandably cause [N.H.] to be concerned and scared. So there is the issue that I actually believe [N.H.].He has been consistent in his concern for his own safety." Thus—contrary to the assessment made by Christopher J.—the court expressly found N.H.'s self-reported fear of Father to be credible.

Reasonable services had been provided, the court found, and although Father "has made some significant and consistent progress, I agree. . . . I do not find that there is a substantial probability that the child -- the children would be returned, in part because we are already past -- we are up to 26 months" from initial removal. Summing things up, the court concluded, "I find by a preponderance of the evidence that there continues to be a substantial risk of detriment to the children's safety, protection, physical and emotional well-being, given their continued insistence that they are afraid to or do not want to return to father's care."

19

Applying the substantial evidence standard, we have no basis to disagree. Upon a review of the entire record, we find substantial evidence supporting the court's view that (1) Father's failure to demonstrate a strong enough bond with the children to warrant returning custody to him was due to his own failure to earn their trust and affection during the 18 months he was given to reunify with them, and (2) there are no extraordinary circumstances beyond Father's control to justify a continuance of the .26 hearing. We therefore conclude the trial court was within its discretion to terminate reunification services to Father and to set a .26 hearing for the children.

## III. DISPOSITION

The petition for mandamus relief is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

STREETER, J.

WE CONCUR:

BROWN, P. J.
HIRAMOTO, J.*

---

\* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.